## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

98 APR -7 AM 8: 5.
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **BILLY W. BROWN, et al.,** ] | |
| ] | |
| Plaintiff(s), ] | |
| ] | |
| vs. ] | CV 89-N-0685-NE |
| ] | |
| **C. D. WALKER, et al.,** ] | |
| ] | |
| Defendant(s). ] | |
| ] | **ENTERED** |
| **Andre M. Toffel, as Trustee for** ] | |
| **James Douglas Graves** and **Dana** ] | APR 0 7 1998 |
| **Graves,** ] | |
| ] | |
| Plaintiff(s), ] | |
| ] | CV-90-N-0886-S |
| vs. ] | |
| ] | |
| **C. D. WALKER, et al.,** ] | |
| ] | |
| Defendant(s) | |

In re the Claims of: B. C. Fowler, Alla Fowler, Andre M. Toffel, as Trustee for James Douglas Graves and Dana Graves, Rebecca Carol Grew, Jeffrey Martin Hayes, Vicky Hayes, Randy Stidham, Frieda Stidham, Freddy Wooten, Cathy Wooten, and Charles Steven Murphree.

### Opinion and Order

**I.    Introduction.**

The claims of these plaintiffs represent the last of a total of 103 individuals, some of

whom are husband and wife, who sued Walker Builders, Inc., C. D. Walker, Terry Walker,

and Allan Walker in connection with certain financial transactions.[1] Common to each of the

_____

[1] The court cannot say with certainty that there was exactly this number of plaintiffs who have appeared in this action at one time or another. Some persons have not always been designated by plaintiffs' counsel by the same name. Some others who apparently never had any claim at all were named. At other times, it appeared that even plaintiffs' counsel were not sure who all the plaintiffs were.

remaining plaintiffs are claims under Alabama's so-called Mini-Code, Ala. Code § 5-19-1,
et seq.[2]

## II.    The Mini-Code.

The plaintiffs all claim that, in connection with certain financial transactions entered
into between themselves and the defendants, one or more of the defendants:  (1) violated
the provision of Ala. Code § 5-19-6, requiring that consumer credit
transaction contracts or notes contain a cautionary statement;[3]  (2) accepted a negotiable
instrument as evidence of a consumer debt in violation of Ala. Code § 5-19-8;[4] and (3)
engaged in the business of making consumer loans without first obtaining a license to do

---

[2] Some of the plaintiffs also have claims under the Federal Truth in Lending Act, 15 U.S.C. §§ 1601, et seq.
("TILA").

[3] At the time of the transactions that are at issue here, Ala. Code § 5-19-6 provided:

Any creditor, when extending credit with respect to a consumer credit sale, loan or lease other
than open-end credit, shall at that time furnish to the debtor duplicate copies of all instruments
executed by the debtor in connection with the transaction. The credit sale contract, loan note
or lease shall contain the following statement in eight point or larger type immediately above the
space for the borrower's signature,
      "CAUTION — IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT
BEFORE YOU SIGN IT."

By Acts 94-115 and 96-576, the Alabama legislature amended this section in ways that are not relevant to the issues
in this action.

[4] In its original form, this section provided:

      In a consumer credit sale or consumer lease, the seller or lessor may not take a
negotiable instrument other than a check as evidence of the obligation of the buyer or lessee.
A holder is not a holder in due course if he takes a negotiable instrument with notice that it is
issued in violation of this section. A holder in due course is not subject to the liabilities
prescribed in this Act.

As will be seen, the Act of 1996, 96-576, amended this section.

so in violation of Ala. Code § 5-19-22.[5] Each of the plaintiffs, on their state law claims seek a declaration that the instruments they signed, in each case those being a promissory note and a real estate mortgage, are null and void. In *Derico v. Duncan*, 410 So.2d 27 (Ala. 1982), the Alabama Supreme Court held that an "indebtedness" incurred as the result of a consumer loan made in violation of the Mini-Code licensing requirement was void. *See also Edwards v. Alabama Farm Bureau Mut. Cas. Ins. Co.*, 509 So. 2d 232, 236 (Ala. Civ. App. 1986) (Failure to comply with requirements of the Mini-Code renders, not only the instrument, but the underlying obligation void.)

As originally enacted, Ala. Code § 5-19-11 stated:

---

[5] As originally enacted, Ala. Code § 5-19-22 provided in pertinent part that:

> No creditor shall engage in the business of making consumer loans, or taking assignments of consumer credit contracts without first having obtained a license for each location from the Administrator, provided however banks chartered by this State or the United States, trust companies, savings or building and loan associations, credit unions, life insurance companies and federally constituted agencies shall be exempt from such licensing.

Section 5-19-22(a) was amended by Act 96-576 so that it now reads:

> No creditor having a place of business in Alabama, or having a resident employee in Alabama whose employment includes making consumer loans or taking assignments of consumer credit contracts shall engage in the business of making consumer loans or taking assignments of consumer credit contracts without first having obtained a license for each location in Alabama from the administrator; provided, however, that a creditor having no place of business in Alabama but having a resident employee in Alabama whose employment includes making consumer loans or taking assignments of consumer credit contracts shall obtain a license for the location where the creditor maintains its records regarding Alabama loans or Alabama consumer credit contracts; and provided further, that, banks chartered by this state or any other state, banks chartered by the United States, trust companies, savings or building and loan associations, savings banks and other thrift institutions, credit unions, life insurance companies, and federally constituted agencies shall be exempt from licensing. A seller, with respect to consumer credit sale transactions and the financing of charges permitted by this chapter, is not required to be licensed under this chapter.

3

No creditor under this chapter shall bring an action on any debt for collection, and no judgment by default or otherwise shall be entered until the creditor shall file an affidavit stating that

(1) There has not been a violation of the provisions of this chapter, and

(2) The debtor, if a resident of this state, on information and belief of creditor is a resident of the county in which the action is filed.

If such violation exists or if the debtor is not a resident of the county in which such action is filed, the action shall be abated.

In April 1990, the section was amended by recasting the old section and by adding

subsections (b) and (c). After the 1990 amendment, Ala. Code § 5-19-11 then read:

(a)    No creditor under this chapter shall bring an action on any consumer debt for collection, and no judgment by default or otherwise shall be entered until the creditor shall file an affidavit stating that

(1)    If the creditor is required to obtain a license under Section 5-19-22, the creditor has obtained such a license, and

(2)    The debtor, or one of the debtors who also is a defendant under the action, if a resident of this state, on information and belief of creditor is a resident of the county in which the action is filed. If the creditor has not obtained the required license or if one of the debtors is not a resident of the county in which such action is filed, the action shall be abated. The provisions of Section 5-19-11(a)(1), above, and the phrase "the creditor has not obtained the required license or if" in the preceding sentence shall not apply in any manner whatsoever to any creditor not required to obtain a license under the provisions of Sections 5-19-22, 5-19-31 or other provision of this chapter.

(b)    Except where other specific remedies are provided in this chapter for violations of specific provisions of this chapter in which event such remedies shall apply, any provision of a consumer credit transaction which violates the provisions of this chapter shall be unenforceable by the creditor to the extent, but only to the extent, of such violation, and the other remaining provisions and agreements shall not be affected by such violation. Any creditor who fails to comply with any requirement imposed under this chapter with respect to any person is liable to such person for the actual damage sustained by such person as a result of the failure.

4

(c)     Nothing in this section shall limit or affect the powers of the administrator provided in this chapter.

The effect of the 1990 amendment was to abrogate the rule of *Derico*—that the note and mortgage are entirely void and unenforceable when a licensing violation occurs. *Farmer v. Hypo Holdings, Inc.* 675 So. 2d 387 (Ala. 1996). Section 5-19-11 of the Alabama Code, as amended in 1990, applies to claims involving alleged Mini-Code violations, where the litigation was begun after April 17, 1990. Ala. Acts 1990, Act No. 90-384, § 4.

Effective May 20, 1996, by Act 96-576, the Alabama Legislature again amended the Mini-Code by, *inter alia*, eliminating *Ala. Code*, § 5-19-11, rewriting the remedies provisions and including them in a new section 5-19-19.[6] Because portions of the new § 5-19-19, if applied retroactively to the plaintiffs' claims, will compel decisions in favor of the defendants on all the state-law claims of these plaintiffs, those portions will be set out verbatim.

§ 5-19-19 **Excess finance charges -- Licensing -- Violations of chapter -- Admissibility of oral statements -- Fiduciary duty.**

\*          \*          \*          \*

(b) A creditor required to obtain a license who fails to obtain such license may not maintain a proceeding in any court in this state on a consumer credit

---

[6] Section 1 of Act 96-576 states:

The Legislature finds as fact and determines that:

(1) The Alabama Consumer Credit Act, Title 5, Chapter 19, Code of Alabama 1975 (commonly referred to as the "Mini-Code"), was enacted by the Legislature by Acts 1971, No. 2052, page 3290. All, or a portion, of the provisions of the Mini-Code apply to substantially all consumer credit transactions in Alabama involving billions of dollars annually.

(2) The availability of consumer credit and certainty of consumer credit transactions is essential to Alabama citizens and the economy of Alabama. Disputes have arisen involving the Mini-Code resulting in significant litigation.

transaction for which a license was required until the creditor obtains the license required by Section 5-19-22. If a court determines that an unlicensed creditor should have obtained a license, the action may be stayed until the creditor obtains the required license and satisfies the requirements of the next sentence of this subsection. The creditor shall pay to the administrator a civil penalty equal to three times the amount of the investigation fee and the annual license fee for each year or portion thereof, the creditor, in violation of Section 5-19-22, has engaged in the business of making consumer loans or taking assignments of consumer credit contracts without first having obtained a license, but in no event shall a civil penalty exceed one hundred thousand dollars ($100,000). All civil penalties shall be paid into the special fund set up by the State Treasurer pursuant to Section 5-2A-20 and used in the supervision and examination of licensees. After obtaining the required license, and paying the civil penalty prescribed by this subsection, the creditor may bring and maintain proceedings in the courts of this state on consumer credit transaction contracts, and the enforceability of the contracts shall not be impaired by the prior failure to obtain a license, irrespective of whether the consumer credit transaction contracts were made before or after the license was obtained. No private cause of action exists against a creditor for failing to obtain a license required by Section 5-19-22.

(c) Except for the specific remedies and obligations provided in subsection (a) with respect to excess finance charges, or subsection (b) with respect to licensing, in which event the remedy and obligations set forth in subsection (a) or (b), as applicable, shall apply, any provision of a consumer credit transaction which violates this chapter shall be unenforceable by the creditor to the extent, but only to the extent, of the violation, and the other remaining provisions and agreements shall be enforceable and shall not be void and shall not be affected by the violation. Except as provided in subsection (a), any creditor who fails to comply with any requirement imposed under this chapter with respect to any person is liable to the person only for the actual economic damages sustained by the person as the result of the failure. Except as set forth in subsection (a), no action may be brought by the debtor under this section based upon a violation of any provision of this chapter more than two years after the date the violation occurred; provided, however, this limitation shall not bar a debtor from asserting a violation of this chapter in an action brought by the creditor, as a matter of defense by recoupment or setoff in such action, if otherwise allowed by law.

(d) A creditor or assignee has no liability to the debtor for any violation of this chapter if, prior to receipt of written notice from the debtor of a violation, the creditor or assignee notifies the debtor of the violation and makes whatever adjustments in the appropriate account, or payments to the debtor, as are

6

necessary to assure that the debtor will not be required to pay an amount in excess of the charges permitted by this chapter.

(e) An oral statement shall not be admissible to contradict the provisions of a credit transaction document, unless the debtor establishes by clear and convincing evidence that the oral statement was made and that it constituted a misrepresentation of a material fact relating to the character or essential terms of the transaction that was made principally to induce the debtor to sign the document and upon which the debtor reasonably relied in signing the document or entering into the transaction. This subsection shall not apply to credit transaction documents in effect on May 20, 1996, nor to causes of action that arise therefrom; nor shall this subsection apply to any credit transaction documents not covered by this chapter.

(f) A consumer credit transaction does not create or give rise to a fiduciary duty on the part of the creditor.

Moreover, Section 4 of Act 96-576 purported to make pertinent provisions of the amended

Mini-Code retroactive. That section provides:

The amendments to Sections 5-19-19, except subsections (a)(1)(ii) and (e), 5-19-22, except subsection (h), and 5-19-31 are retroactive and are to be applied to consumer credit transactions entered into on, before, and after the effective date of this act. The amendments to all other sections in this act not specifically stated to be retroactive in this Section 4 shall be prospective in nature and shall be operative only as to transactions entered into after the effective date of this act.

As noted above, Act 96-576 was enacted and became effective on May 20, 1996. Finally,

Section 7 of Act 96-576 provides that "if any part of this act . . . or the application thereof to

any person or circumstance is declared invalid or unconstitutional, that declaration shall not

affect the part which remains or the application of this act to any other person or

circumstance."

The defendants have moved the court to dismiss the plaintiffs' Mini-Code claims,

proceeding on the assumption that the amendments to the Mini-Code must be applied

7

retroactively, as expressly provided in the amending act. They assert that four provisions of the amended Mini-Code compel judgment against the plaintiffs: (1) the plaintiffs may now recover only for actual economic damages suffered by them and they have proved no actual damages, economic or otherwise; (2) there is now no private cause of action against a creditor for failure to obtain the license required by § 5-19-22; (3) all the claims are barred by the new two-year period of limitations; and (4) now a consumer credit transaction which violates the Mini-Code is unenforceable against the debtor only to the extent of the violation. Plaintiffs, on the other hand, assert that "certain provisions" of the amended statute are "unconstitutional." Their entire argument in this regard, as originally made, can be summed up in two sentences: "The plaintiffs hereby submit that certain provisions of the new Mini-Code legislation are unconstitutional to the extent those provisions are *applied* to the present case. The provisions concerning licensing and the applicable statute of limitations are unconstitutional to the extent the plaintiffs are deprived of due process." (Emphasis in original.) Strangely, though they were invited by the court to address the applicability of the 1996 amendments to the Mini-Code to the claims of these plaintiffs, neither the plaintiffs nor the defendants, until expressly directed to do so in an order entered on November 14, 1997, addressed applicable Alabama law regarding the circumstances in which acts of the Alabama legislature may, consistent with Alabama constitutional principles, affect the rights of parties to pending litigation.

In reviewing the constitutionality of a state statute, the Alabama Supreme Court will "approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the

8

government." *Alabama State Federation of Labor v. McAdory*, 18 So. 2d 810, 815 (Ala. 1944). Nevertheless, if it clearly appears that an act of the legislature unreasonably invades rights guaranteed by the Constitution, the Court not only has the power but the duty to strike it down. *City of Russellville v. Vulcan Materials Co.*, 382 So. 2d 525 (Ala. 1980); *Peddycoart v. City of Birmingham*, 354 So. 2d 808 (Ala. 1978).

Contained within the Alabama constitution are three provisions which arguably impact on the court's consideration of retroactivity of the 1996 amendments to the Mini-Code. The first, Article I, § 22 ("§ 22"), provides:

> That no *ex post facto* law, nor any law, impairing the obligations of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment.

Ala. Const. art. I, § 22 (1901). This section, insofar as it impacts on the Mini-Code amendments, may be disposed of quickly. Alabama law is clear that § 22 applies only to penal and criminal laws and not to civil laws, which affect private rights adversely. *Calder v. Bull*, 3 Dall. 386, 1 L. Ed. 648 (1798); *Aldridge v. Tuscumbia, etc., R.R.*, 2 Stew. & Port. 199 (Ala.1832); *Bloodgood v. Cammack*, 5 Stew. & Port. 276 (Ala. 1834); *Elliott v. Mayfield*, 4 Ala. 417 (1842); *State ex rel. Brassell v. Teasley*, 69 So. 723 (Ala. 1915); *Ward v. State*, 170 So.2d 500 (Ala. App. 1964), *cert. denied*, 170 So. 2d 504 (Ala. 1965); *Reed v. Brunson*, 527 So. 2d 102, 114 n.5 (Ala. 1988); 16A C.J.S., Constitutional Law § 409, 412 (1984).

On the other hand, Article I, § 13 ("§ 13") and Article IV, § 95 ("§ 95"), have the effect of limiting legislative action which impacts on the rights of civil litigants. Section 13, provides:

9

> That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay.

Ala. Const. art. I, § 13 (1901).

Historically, the purpose of § 13 has been to protect citizens from the once existing evil of holding courts in clandestine sessions and of paying "fines" to the king and his officers for delaying or expediting lawsuits.   *Swan v. Kidd*, 79 Ala. 431 (1885).   This provision protects against arbitrary action by those with authority because "all other rights would be worthless if the government had uncontrollable power over private fortunes." *Jones v. Nashville*, C. & St. L. Ry., 37 So. 677 (Ala. 1904).

The Alabama Supreme Court has held that under § 13 the right to a remedy must remain open and cannot be curtailed after the injury has occurred and the right of action has "vested." *Pickett v. Matthews*, 192 So. 261 (Ala. 1939).   This section has historically formed the basis for attacks on new legislative enactments. *See e.g. Henley v. Rocket*, 8 So. 2d 852 (Ala. 1942) (constitutional challenge to abolition of statute for damages for alienation of affection); *Woodward Iron Co. v. Bradford*, 90 So. 803 (Ala. 1921) (constitutional challenge to the Alabama Workmen's Compensation Act); *Chapman v. Railway Fuel Co.*, 101 So. 879 (1924) (same). Seemingly, however, under the "vested rights" approach, as applied by the Alabama Supreme Court, most such statutes have survived § 13 constitutional challenges, e.g., *Coosa River Steamboat Co. v. Barclay & Henderson*, 30 Ala. 120 (1857); *Peevey v. Cabaniss*, 70 Ala. 253 (1881); *Chapman*, 101 So. 879; *Gentry v. Swan Chem. Co.*, 174 So. 530 (Ala. 1937); *Pickett*, 192 So. 261 (Ala. 1939).

10

Though historically applying a "vested rights" approach to its § 13 jurisprudence, the

Alabama Supreme court, beginning with *Grantham v. Denke*, 359 So. 2d 785 (Ala. 1978),

added what it has called a "common-law rights" approach. *See Reed v. Brunson*, 527 So.

2d 102 (Ala. 1988). The *Reed* court surveyed the Alabama § 13 jurisprudence in some detail

and much of what it said there bears repeating here. The court noted that § 13 had

historically been viewed to "apply only in instances where a litigant had a vested interest

in a particular cause of action." *Reed*, 527 So. 2d at 114. It went on:

> [W]hen a duty has been breached producing a legal claim for damages, such
> claimant cannot be denied the benefit of his claim for the absence of a
> remedy. But this provision does not undertake to preserve existing duties
> against legislative change made before the breach occurs. There can be no
> claim for damages to the person or property of anyone except as it follows
> from the breach of a legal duty.

*Pickett v. Mathews*, 192 So. 2d 261, 263 (Ala. 1939).

The court next discussed the "common-law rights" approach, adopting in part the

concurring opinion of Justice Shores in *Fireman's Fund American Insurance Co. v.*

*Coleman*, 394 So. 2d 334 (Ala. 1981), where she wrote:

> Legislation which abolishes or alters a common-law cause of action, then, or
> its enforcement through legal process, is automatically suspect under § 13.
> It is not, however, automatically invalid. *Grantham* itself restates the
> established rule that such legislation will survive constitutional scrutiny if one
> of two conditions is satisfied:
>
> 1. The right is voluntarily relinquished by its possessor in exchange for
> equivalent benefits or protection, or
>
> 2. The legislation eradicates or ameliorates a perceived social evil and is thus
> a valid exercise of the police power.
>
> I find it helpful to think of these alternatives as two different aspects of the
> quid pro quo concept: Thus, a right may be abolished if the individual

possessor receives something in return for it (the individual *quid pro quo* dwelt upon in *Grantham*), or if society at large receives a benefit (thereby justifying exercise of the police power).

*Fireman's Fund*, 394 So. 2d at 352 (Shores, J. concurring). The rule is moderated by the

court's duty to defer to the legislative branch except in cases of clear excess. "Who is to

determine whether [society at large receives a benefit by the deprivation of the common

law remedy], the legislature or the courts?" *Id.* at 352-53. All questions of "propriety,

wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies,

and are matters with which the courts have no concern. This principle is embraced within

the simple statement that the only question for the court to decide is one of power, not of

expediency or wisdom." *McAdory*, 18 So. 2d at 815. Further, as Justice Beatty wrote in his

*Fireman's Fund* dissent:

> The limitations upon the legislature's exercise of the police power are few; as was said in *Alabama State Federation of Labor v. McAdory*, 246 Ala. 1, 13, 18 So.2d 810 (1944):
>
>> [The police] power must not be exercised arbitrarily or capriciously, and there must be some reasonable relation [between] the regulation and the ends to be attained. But if upon the matter men may reasonably differ, in view of all the circumstances, the legislative act in the exercise of the police power must be sustained. (emphasis added by Justice Beatty)

*Reed*, 527 So.2d at 116 (quoting *Fireman's Fund*, 394 So.2d at 357).

The court must next look to Article IV, § 95 of the Alabama Constitution. That section

provides:

> There can be no law of this state impairing the obligation of contracts by destroying or impairing the remedy for their enforcement; and the legislature shall have no power to revive any right or remedy which may have become barred by lapse of time, or by any statute of this state. After suit has been

12

commenced on any cause of action, the legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit.

On its face, § 95 does three things. First, it proscribes any statute that would impair the "enforcement" of a remedy. Alabama courts, however, have consistently held that the § 95 right to enforce a remedy "vests" only after a judgment has been rendered and it is the enforcement of the judgment to which the right attaches. *John E. Ballenger Constr. Co. v. State Bd. of Adjustment*, 175 So. 387 (1937); *Moore v. Howard*, 149 So. 249 (1933).

Next, consistent with § 95, the legislature may not change a limitations period if the change would "revive" a cause of action that is already time barred. *See Johnson v. Garlock*, 682 So.2d 25 (Ala. 1996). It may, however, make changes that would effectively foreclose an action not already filed.[1] *Id.*

Finally, § 95 removes from the legislature the "power to take away [a] cause of action, or destroy any existing defense to such suit." Ala. Const. art. IV, § 95. This prohibition upon the removal a cause of action or a defense refers to matters of substance and not to form. *Skains v. Barnes*, 53 So. 268 (Ala. 1910) ("Defense" as used in § 95 "signifies matter tending to defeat the plaintiff's cause of action, and not merely the form in which the plaintiff undertakes to state his cause of action.")

Closer examination reveals that the Alabama courts have looked more favorably upon retroactive changes that have effected procedure only, while being less inclined to accept changes that have effected substantive rights already vested. In *Scheuing v. State*

---

[1] The legislature has the inherent power to determine reasonable limitations periods. *Sellers v. Edwards*, 265 So.2d 438 (1972); *Plant v. R.L. Reid, Inc.*, 313 So.2d 518 (1975). And, the legislature may retroactively alter, extend, or curtail an existing limitations period, provided the action was not already time barred, but to revive an already barred action would contravene § 95. *Johnson*, 682 So. 2d at 27.

13

*ex rel. Brickell*, 59 So. 160 (Ala. 1912), the unsuccessful candidate for sheriff of Cullman County brought an action before the Probate Court to contest the election, as § 470 of the then current code allowed him to do. After the plaintiff secured a judgment in his favor, the legislature amended § 470 to require that such challenges be brought in the circuit court. The Alabama attorney general filed a petition for the Writ of Quo Warranto to remove the challenger from office. With regard to § 95, the Alabama Supreme Court noted first that election contests are of purely statutory origin and do not otherwise exist. It also noted that no party "has a vested right in any particular remedy." *Id.* at 160. The court concluded, "The cause of action, against the taking away of which by the Legislature   section 95 of the Constitution provides, necessarily comprehends only causes of action arising out of the violation of vested legal rights of some description. A public office, in this state, is a 'personal public trust, created for the benefit of the state,' and 'has in it no element of property.'" *Id.* at 161 (citing *Ex parte Lambert*, 52 Ala. 79, 82; *Lovejoy v. Beeson*, 25 So. 599 (Ala. 1899)). Thus, the court in *Scheuing*, used the "vested rights" approach to approve the retroactive application of an act that had the effect of depriving a party of his cause of action, the election contest.

In *State Board of Optometry v. Lee Optical Company of Alabama, Inc.*, 226 So. 2d 623 (Ala. 1969), a state regulatory agency sued thirteen optometrists and Lee Optical, a business that operated optical stores and employed the individual optometrists, claiming they were engaged in the unlawful practice of optometry. The trial court sustained the defendants' pleas in abatement on grounds that: (1) the Board of Optometry had no authority to sue in its own name and no right to maintain the action; and (2) quo warranto

14

was the exclusive remedy available to address their conduct. While the matter was on appeal the legislature enacted Act 67-509. Section 1 of the act provided, in pertinent part, "The unauthorized or unlawful practice of any profession, occupation, or calling by any person, firm or corporation may be enjoined by any court of competent jurisdiction on complaint brought in the name of any public body or officer having authority conferred by statute to regulate or to license the activity engaged in by such person, firm or corporation."[8] Act of Ala. 1967, Vol. II, p. 1225 (Sept. 7, 1967). In sustaining the new statute against constitutional challenge, the court held that the applicable prohibition of § 95 applied only to matters of substance and not to matters of form or to statutes that are remedial in nature, and that the new Act goes "only to matters of substance and not to matters of form or to statutes which are remedial in nature." *Id.* at 625. The court further supported its conclusion by quoting from § 2218, Sutherland Statutory Constitution, 3rd Ed., Vol 2. pp. 144-145, where it was said:

> The general constitutional limitations against destruction of vested rights and impairment of contractual obligations operate on curative acts affecting courts, but no person has a vested right in a particular remedy for enforcement of a right, or in particular modes of procedure. The legislature may pass retroactive acts changing, eliminating, or adding remedies, so long as efficacious remedies exist after passage of the act. Curative acts affecting courts will apply to pending litigation.

*Id.* at 625-626. Because Act 67-509 changed only the means by which the unauthorized practice of optometry was to be addressed it was permissible under § 95.

---

[8] The court expressly noted that Act 67-509 "is obviously a curative act, designed to give the State Board of Optometry and similar regulating bodies the right to institute proceedings in the courts of this state to enjoin persons and corporations from the 'unauthorized or unlawful practice of any profession, occupation, or calling.'" *Lee Optical.*, 226 So.2d at 625.

The Alabama Supreme Court has approved retrospective application of a statute that revived the right of execution on a judgment even though the effect was to give the judgment priority over the judgment of a another. The court wrote:

> The only change made by the act of 1903, which is material to this case, is to provide that "upon any judgment or decree which has been filed or registered as provided by section one hereof within ten years" execution may issue. So the effect of that act was not to change the rights or interests of the parties in or to the property, but merely to give the complainant a remedy by execution to enforce the lien, which appellant admits he had.

> "Statutes designed to change the mode of judicial procedure, where such change relates to the method of enforcing a right and does not affect the right itself, are construed to apply to causes of action which accrued before the enactment, as well as those to accrue thereafter." 26 A. & Eng. Ency. Law, p. 695; *Coosa, etc. Co. v. Barclay*, 30 Ala. 120 *Willis v. State*, 134 Ala. 429, 38 South. 226; 2 Mayfield's Dig. 710

*Jefferson County Sav. Bank v. Miller*, 40 So. 513, 514 (Ala. 1906).

In *Brannan v. Henry*, 57 So. 967 (Ala. 1912), the court held that a statute authorizing the introduction of documents into evidence, which were executed at a prior time and which purported to convey state land, and also giving such documents a *prima facie* evidentiary effect did not offend the provisions of § 95 when applied to an action brought several years before passage of the act. The court said:

> A clause of section 95 of the Constitution provides that: "After suit has been commended on any cause of action, the Legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit." Retrospective legislation dealing with the laws of evidence in criminal prosecutions and rendering a conviction more easy than it would have been at the time when the offense was committed is ex post facto and prohibited; but "the rule is otherwise as to changes in the rules of evidence in civil cases. These pertain to the remedy, and form no part of the obligation of an existing contract. It is a plain proposition, free from all doubt that no one possesses a vested right to existing rules of evidence, in civil causes of action, and the lawmaking power is at liberty to change them, from time to

16

time, with the broad latitude of their sound discretion." *Goodlett v. Kelly*, 74 Ala. 213; *State v. Thomas*, 144 Ala. 77, 40 So. 271, 2 L. R. A. (N. A.) 1011, 113 Am. St. Rep. 17, 6 Ann. Cas. 744. And the general principle is that statutory alterations in rules and methods of procedure, including rules of evidence, are always retrospective unless there be some good reason against it. Englich, Interp. State. §§ 282, 286. "Statutes which relate alone to the remedy, without creating, enlarging, or destroying the right, operate generally on existing causes of action, as well as those which afterwards accrue." *Coosa River Co. v. Barclay*, 30 Ala. 120; *Tutwiler v. Tuskaloosa Co.*, 89 Ala. 391, 7 So. 398; *Birmingham Trust & Savings Co. v. Currey*, 57 So. 962. The act of 1911 in form provides a rule evidence.

*Brannan*, 57 So. at 969. Of similar effect is *Miller-Brent Lumber Co. v. State*, 97 So. 97 (Ala. 1923).

In a case in which the legislature, after suit was brought, amended the statute governing the right of a governmental employee to seek judicial review of an adverse employment action to permit the employee to proceed without posting a cost bond, the court said:

The general rule is . . . that "[r]emedial statutes . . . are not within the legal [concept] of 'retrospective law,' . . . and do operate retroactively, in the absence of language clearly showing a contrary intention." *Street v. City of Anniston*, 381 So. 2d 26, 29 (Ala. 1980). *See Jones*, 448 So. 2d at 875, *citing Street*. In other words, "[r]emedial statutes–those which do not create, enlarge, diminish, or destroy vested rights–are favored by the courts, and their retrospective operation is not obnoxious to the spirit and policy of the law." . . . Remedial statutes are exemplified by those that "'impair no contract or vested right, . . . but preserve and enforce the right and heal defects in existing law prescribing remedies.'"

*Ex parte Bonner v. State Dep't of Human Resources*, 676 So. 2d 925, 926 (Ala. 1995).

Finally, in a recent decision, the Alabama Court of Civil Appeals held that the provision of Ala. Code § 5-19-19 that purports to extinguish all private causes of action against a creditor who fails to obtain the license required by Ala. Code § 5-19-22 may not

be applied retroactively to dismiss licensing claims in suits that were pending on May 20,

1996. *Smith v. ALFA Fin. Corp.*, 1997 WL 607244 (Ala. Civ. App. Oct. 3, 1997) (not yet

released for publication). The *Smith* plaintiffs had filed their lawsuit on May 15, 1996, five

days before the 1996 amendments to the Mini-Code. The trial court, relying on the explicit

retroactivity provision in the amendments,  dismissed the action. On appeal, the Alabama

Court of Civil Appeals reversed, saying "the people of this state placed into our

fundamental law the principle that the initiation of a civil action abrogates the legislature's

ability to take away the cause of action upon which the plaintiff seeks relief." *Id.* at *4. In

comparing the 1990 amendments to the 1996 amendments to the Mini-Code, the *Smith* court

said,

> [A]lthough the legislature in 1990 did not abolish the cause of action
> recognized by the Derico court, it did alter the remedy for certain violations
> of the Mini-Code. Under § 5-19-11 after its 1990 amendment, a Mini-Code
> violation without a specific remedy set forth in the Mini-Code itself would
> give rise only to a right to recover for actual damage flowing from the
> violation; it would no longer render the credit contract void, as under *Derico*.

> Act No. 96-576, unlike the legislature's 1990 alteration of the *Derico* cause of
> action, is designed to abolish private causes of action for violations of § 5-19-
> 22. Not only does it repeal § 5-19-11 in its entirety, it specifically amends § 5-
> 19-19(b), another portion of the Mini-Code, to provide that "[n]o private cause
> of action exists against a creditor for failing to obtain a license required by
> Section 5-19-22." Act No. 96-576, § 2. In addition, Act No. 96-576 contains an
> unusual provision stating that the pertinent "amendments to Sections 5-19-19
> . . . are retroactive and are to be applied to consumer credit transactions
> entered into on, before, and after the effective date of this act." *Id.* § 4.

> Further, unlike the legislature's 1990 amendment limiting recovery to actual
> damages, Act No. 96-576 is not "remedial" in nature. Act No. 96-576 goes
> much further than merely addressing the remedies of a private party -- its
> effect is to abolish substantive causes of action inuring to private parties
> under the Mini-Code. A private party may no longer sue a creditor that
> should have obtained a license under § 5-19-22 for actual damage flowing

from the creditor's prohibited conduct--Act No. 96-576 not only repeals the
remedial provisions of § 5-19-11, but also affirmatively declares that "[n]o
private cause of action exists against a creditor for failing to obtain a license
required by Section 5-19-22." Act No. 96-576, § 2 (now codified as § 5-19-
19(b), *Ala. Code* 1975) (emphasis added).

*Smith*, 1997 WL 607244, at \*3.

It is important to note that the *Smith* court was faced with a single constitutional

question, whether that part of the amended Act which purported to take away the plaintiffs'

action based upon the defendant's failure to secure the license required at Ala. Code § 5-

19-22 could, consistent with the proscription of § 95, be applied to them after they had filed

suit. The court answered that "§ 95, Act No. 96-576 cannot apply to deprive the plaintiffs of

their right to seek damages from Alfa for actual harm caused by its alleged failure to comply

with the licencing provisions of the Mini-Code." *Id.* at \*4. The court went to some effort to

compare some provisions of the 1990 amendment to the no-cause-of-action provision of the

1996 amendments and concluded that, unlike provisions of the 1996 amendments, the 1990

amendment did not take away a cause of action but merely changed the available remedy

by limiting plaintiffs to the actual damage sustained by reason of the failure of a creditor to

comply with the requirements of the Mini-Code. *Id.* Despite some language in the *Smith*

opinion that might be read to indicate that the court addressed the constitutionality of the

1996 amendments generally and held that they violated § 95, the court is satisfied that the

Alabama court's ruling is properly limited to holding that the no-cause-of-action provision

of § 5-19-19(b) may not be applied retrospectively to claims on which litigation had been

commenced prior to May 20, 1996.

Much of what the *Smith* court said about the 1990 amendments is clearly *dicta*. First, the retrospective application of the 1990 amendments was not at issue in the *Smith* case. At least as important is that Alabama Acts 1990, Act No. 90-384, § 4, specifically provided that the amendments would apply only to claims for which litigation was begun after April 17, 1990. The court's own review of the applicable Alabama law suggests that the other three provisions of the 1990 amendments that are at issue, may not, consistent with Section 95, be applied retroactively to the claims of these plaintiffs. Under Section 95, "'[r]emedial statutes–those which do not create, enlarge, diminish, or destroy vested rights–are favored by the courts, and their retrospective operation is not obnoxious to the spirit and policy of the law.' . . . Remedial statutes are exemplified by those that 'impair no contract or vested right, . . . but preserve and enforce the right and heal defects in existing law prescribing remedies.'" *Ex parte Bonner*, 676 So. 2d at 926. It can hardly be argued that retroactive application of a two-year period of limitations to the claims of these plaintiffs would destroy their causes of action. Likewise, application of provisions limited them to recovery for actual damages or voiding the contracts only to the extent that a violation would "diminish" claims already vested at the time of the amendments.

The court thus concludes that these amendments may not withstand Section 95 challenges to their retrospective application to these claims.

Likewise, under Section 13 jurisprudence, whether applying the "vested rights" approach, *Pickett v. Mathews*, 192 So. 2d 261 (Ala. 1939), or the "common-law rights" approach, *Fireman's Fund American Insurance Co. v. Coleman*, 394 So. 2d 334 (Ala. 1981) (Justice Shores concurring), the four provisions at issue cannot be applied retroactively. In

the case of each plaintiff, the alleged violations of the Mini-Code occurred long before the 1996 amendments and, under the pre-existing law, they were, upon proof of the violations, entitled to certain relief. These last amendments would completely remove from the plaintiffs any right to recover based upon those violations.

Under the "common-law rights" approach, there is no evidence of any equivalent benefits or protection accruing to the plaintiffs in return for their having voluntarily relinquished their rights. Also, the legislature, though citing the need for more stable and reliable availability of consumer credit, identified no particular "social evil" which it intended to address by the 1996 amendments. Thus, the court holds that the four provisions at issue may not be applied retroactively to these claims.

## III. Claims Brought After April 17, 1990.

### A. Jeffrey Martin Hayes and Vicky Hayes.

Jeffrey Martin and Vicky Hayes were building a house for themselves and arranged with Walker Builders, Inc. for the purchase of building materials from Walker and for financing to pay for labor and materials purchased from suppliers other than Walker. To secure repayment of the debt incurred under this arrangement, Mr. and Mrs. Hayes signed a note and a mortgage (Hayes Hearing, Plaintiff's Exhibit 1) in the amount of $26,000 in favor of Walker Builders, Inc., on October 22, 1986. These were to secure the purchase of approximately $22,000 worth of building materials from Walker Builders, Inc. and $4,000 paid by Walker Builders to other suppliers of materials for the house.

Neither the note nor the mortgage contained the cautionary language required by Ala. Code § 5-19-6 as it existed on October 22, 1986. Walker Builders, Inc. was not licensed

21

to make consumer loans under Ala. Code § 5-19-22, and the note they signed was a negotiable instrument other than a check taken as evidence of an obligation incurred in a consumer credit sale, in violation of Ala. Code § 5-19-5, as it was written and existed prior to May 20, 1996. The Hayes plaintiffs offered no evidence of loss, actual or otherwise, occasioned by any of the violations.

Mr. Hayes  testified that he understood he was signing a note and mortgage which obligated him to repay the amount of the debt together with interest.

Mr. and Mrs. Hayes first brought their individual claims in this action when they appeared as plaintiffs in the Sixth Amended Complaint, filed on September 4, 1990. Mr. Hayes testified that he attended a meeting in Cullman, Alabama, several months before he agreed to become a plaintiff. The evidence did not indicate the date of the Cullman meeting. A "Mrs. Hayes" was listed as a plaintiff when the First Amended Complaint was filed on August 18, 1989, and "Mrs. Hayes" was again listed as a plaintiff when the Fourth Amended Complaint was filed on May 3, 1990. It was not, however, until the Sixth Amended Complaint was filed on September 4, 1990, that Jeffrey Martin "Haynes" and Vicky Hayes were listed as plaintiffs.[9] The plaintiffs offered no evidence that either "Mrs. Hayes" or "Hayes" was intended to or that they did designate them as plaintiffs in the action or that they had in fact agreed to become plaintiffs before April 17, 1990. Moreover, Mr. Hayes was unable to testify that the listing of "Mrs. Hayes" and "Hayes" in the earlier complaints was intended to designate either himself or his wife as plaintiffs in this law suit.

_____

[9]The court has inferred that "Haynes" was intended to designate the plaintiff, Jeffrey Martin Hayes.

Rule 10(a) of the Federal Rules of Civil Procedure requires that the complaint list the names of all the parties in the caption. As noted, Mr. and Mrs. Hayes were first listed as plaintiffs in the Sixth Amended Complaint, filed on September 4, 1990. The court concludes that they have failed to prove that they brought their claims before the effective date of the 1990 amendments and their claims are governed by the Mini-Code as it was written between April 17, 1990, and May 20, 1996.[10/]

The Alabama Court of Civil Appeals has provided the answers to all the Hayes' Mini-Code claims. In *Cantrell v. Walker Builders, Inc.* 678 So. 2d 169 (Ala. Civ. App. 1996), the court held that the failure of a creditor to have the license required by Ala. Code § 5-19-22 did not void the note and mortgage and did not extinguish the underlying debt where litigation was begun after April 17, 1990. The court wrote:

> [A] recent supreme court opinion addressing the issue of Mini-Code licensing violations makes it clear that the common law rule adopted in *Derico* is no longer the law in Alabama: "[T]he rule of *Derico* was abrogated when the legislature amended Ala. Code 1975, § 5-19-11, and created a specific statutory remedy." *Farmer v. Hypo Holdings, Inc.*, 675 So.2d 387, 389 (Ala.1996).
>
> In 1990, the legislature, by Ala. Acts 1990, Act No. 90-384, amended § 5-19-11, Ala. Code 1975, adding subsections (b) and (c). Subsection (b) reads as follows:
>
>> Except where other specific remedies are provided in this chapter for violations of specific provisions of this chapter in which event such remedies shall apply, any provision of a consumer credit transaction which violates the provisions of this chapter shall be unenforceable by the creditor to the extent, but only to the extent, of such violation, and the other remaining provisions and agreements shall not be affected by

---

[10/] The court has previously held that parties who were not named as plaintiffs in this action prior to April 17, 1990, did not have litigation "pending" on that date.

> such violation. Any creditor who fails to comply with any
> requirement imposed under this chapter with respect to any
> person is liable to such person for the actual damage sustained
> by such person as a result of the failure.

Subsection (b), as amended, "provides that a debtor may recover only for the
actual damage sustained as a result of the creditor's violation of a Mini- Code
requirement." *Farmer*, 675 So.2d at 389. Hence, the rule of *Derico*--that the
note and mortgage are entirely void and unenforceable when a licensing
violation occurs--is no longer the law in this state. *Id.* Subsection (b) applies
to claims involving alleged Mini-Code violations, the litigation of which was
commenced after April 17, 1990. Ala. Acts 1990, Act No. 90-384, § 4. The
Cantrells filed their complaint on August 22, 1990.

*Cantrell,* 678 So. 2d at 171-72.

The *Cantrell* court then addressed the plaintiffs' claim that the signature provisions

of the note and mortgage were unenforceable due to the creditor's failure to comply with

the cautionary statement provision of *Ala. Code*, § 5-19-6. The court said that even though

there is a violation, "it does not necessarily follow that the note is automatically

unenforceable because of this violation. Pursuant to § 5-19-11(b), the [plaintiffs] are entitled

to compensation [only] for the *actual damage* suffered, claimed, and proved by them, as

a result of the failure to provide the required cautionary statement." *Id.* at 172. (emphasis

original)  Because the plaintiffs in *Cantrell* were unable to offer any evidence of actual

damage, they were precluded from any recovery for the defendant's violation of the

cautionary language requirement of *Ala. Code*, § 5-19-6. *Id.*

With regard to the Cantrell's negotiable instrument claim, the court wrote:

The Mini-Code forbids a creditor to take a negotiable instrument, other than
a check, as evidence of a consumer credit sale. § 5-19-5, Ala. Code 1975.
The Cantrells contend that because Walker took a note as evidence of the
Cantrells' obligation, Walker violated § 5-19-5;  they say this violation makes
the note unenforceable under § 5-19-11(b).  We disagree.  Even if the

transaction was a credit sale, a violation of § 5-19-5 does not mean that the instrument is unenforceable; rather, it signifies that the creditor, who because of the violation may not assert holder-in-due-course status, will receive no special exemption from the liabilities prescribed in the Mini-Code. The borrower is still required to prove that the obligation is unenforceable, whether wholly or partially, regardless of the creditor's status as merely a holder. As discussed previously in this opinion, the Cantrells cannot show that the note is unenforceable under the Mini-Code. Accordingly, Walker's alleged status as a holder would not alter the resolution of this case.

*Cantrell,* 678 So. 2d at 173-174.

Thus, the lessons of *Cantrell* are these: (1) in cases where the litigation was begun after April 17, 1990, a Mini-Code covered transaction is "unenforceable by the creditor to the extent, but only to the extent, of . . . [a] violation" of Ala. Code, Title 5, Chapter 19; (2) a violation of the cautionary statement requirement of Ala. Code § 5-19-6 will entitle the debtor to compensation for only the actual damage proved to have resulted from the violation; and (3) the effect of taking a prohibited negotiable instrument as evidence of an obligation is that one to whom such an instrument is transferred will not be a holder-in-due-course and will receive no special exemption from the liabilities prescribed in the Mini-Code.

It is evident then that the note and mortgage signed by Mr. and Mrs. Hayes is enforceable despite the defendants' failure to obtain and maintain a license except to the extent that the Hayeses have proved another violation of the Mini-Code. Moreover, since they have proved no actual damage, the note and mortgage did not become unenforceable for failure to include the required cautionary statement above their signature lines. Finally, the taking of a prohibited negotiable instrument provides no basis for voiding the note and

mortgage. For these reasons, judgment will be entered against the Hayeses on all their claims under the Mini-Code.

### B.   Freddie and Cathy Wooten.

Freddy and Cathy Wooten signed a promissory note (Wooten Hearing, Plaintiff's Exhibit 12) and mortgage (Wooten Hearing, Plaintiff's Exhibit 13) in the amount of $39,000 payable to Walker Builders, Inc. on October 18, 1988. Of that amount, approximately $13,000 was used to purchase building materials from Walker to be used in the construction of a cabinet shop behind their home and $26,746.69 was used to satisfy a first mortgage obligation to the Bank of Powell so that Walker Builders would obtain a first priority security in the real property upon which the cabinet shop was located.

Neither the note nor the mortgage contained the cautionary language required by Ala. Code § 5-19-6, as it existed on October 18, 1986. Walker Builders was not licensed under Ala. Code § 5-19-22, and the note the Wootens signed was a negotiable instrument other than a check taken as evidence of an obligation incurred, at least in part, in a consumer credit sale, in violation of Ala. Code § 5-19-5, as it was then written. The Wootens offered no evidence of loss, actual or otherwise, occasioned by any of the violations. Mr. Wooten testified that he understood he was signing a note and mortgage which obligated him to repay the amount of the debt together with interest.

Mr. and Mrs. Wooten became plaintiffs in this action when the Sixth Amended Complaint was filed on September 4, 1990. Thus, their Mini-Code claims are governed by the statute as it existed following the amendments of April 17, 1990.

For the same reasons that Mr. and Mrs. Hayes cannot recover, *Cantrell* dictates that Mr. and Mrs. Wooten likewise cannot recover. They have proved no violation of the Mini-Code, other than the failure to obtain a license. They proved no actual damages, and failure to include the required cautionary statement above their signature lines does not render the note and mortgage unenforceable. Finally, the taking of a prohibited negotiable instrument other than a check provides no basis for voiding the note and mortgage. Judgment will be entered against the Wootens on all their claims under the Mini-Code.

The court has previously entered judgment in favor of the Wootens on their § 1640 TILA claim but has not yet awarded damages. On the TILA claim, they will be awarded statutory damages of $1,000 and attorney fees of an additional $500.00.

### C.    Charles Steven Murphree.

At the trial of his claims, plaintiff Murphree did not testify but chose to rely only upon documentary evidence and certain stipulated facts. Mr. Murphree executed a note (Murphree Hearing, Plaintiff's Exhibit 9) and mortgage (Murphree Hearing, Plaintiff's Exhibit 11) in the amount of $22,000 in favor of Walker Builders, Inc. on September 3, 1987. The amount obtained was to be used for the purchase of real property and building materials. Neither the note nor the mortgage contained the required cautionary statement. The note represented a negotiable instrument taken, in part, as evidence of an obligation incurred as a part of a credit sale, and Walker Builders, Inc. did not hold a license issued under Ala. Code § 5-19-22. Murphree offered no evidence that he suffered any actual damage resulting from any violation. Mr. Murphree was first added as a plaintiff in this action on September 4, 1990.

27

Cantrell dictates that the note and mortgage signed by Mr. Murphree are unenforceable by reason of the defendants' failure to obtain and maintain a license only to the extent of another violation of the Mini-Code. He proved no damage, actual or otherwise. Thus, the note and mortgage are not unenforceable for failure to include the required cautionary statement above the signature line. Finally, the taking of a negotiable instrument other than a check provides no basis to void the note and mortgage. Judgment will be entered against Mr. Murphree on all his Mini-Code claims.

## IV.   Claims Brought Before April 17, 1990.

### A.   Randy and Frieda Stidham.

Following a fire at their home in January 1985, Randy and Frieda Stidham established an open account with Walker Builders, Inc. for the purpose of purchasing building materials and supplies to rebuild their home. They expected that they would soon secure permanent financing, but by March 12, 1987, when they had not been able to make permanent arrangements to finance their new home, they executed a note (Stidham Hearing, Plaintiff's Exhibit 15) and mortgage (Stidham Hearing, Plaintiff's Exhibit 16) in the amount of $20,675.86 in favor of Walker Builders, Inc., to secure repayment of the debt incurred on their open account. Neither the note nor mortgage contained the cautionary statement required by the Mini-Code. The note was a negotiable instrument other than a check and Walker Builders, Inc. was not licensed under the Mini-Code.[11] Mrs. Stidham testified that

---

[11] Frieda Stidham was first shown as a plaintiff in this action in the Second Amended Complaint, filed on August 18, 1989. Her husband first appeared in the Sixth Amended Complaint on September 4, 1990. The defendants have raised no question regarding whether they should be treated differently because one joined the action before April 17, 1990, and the other after that date.

they received no disclosure statement required by TILA at the time of closing but that they received them through the mail after the closing instead. The TILA disclosure statement (Stidham Hearing, Plaintiff's Exhibit 17) was signed by Mrs. Stidham on March 12, 1987. Mr. Stidham's signature is not dated. The Stidham's did not receive a notice of their right to rescind the transaction.

Mr. Stidham understood that he was executing a promissory note and a mortgage and that he and Mrs. Stidham were obligated to repay the amount represented by these instruments. These plaintiffs offered no evidence that they suffered any actual damages or injury as a result of the Mini-Code violations.

Clearly, the series of transactions between the Stidhams and Walker represented nothing more nor less than a series of credit sales. Over a period of some two years, the plaintiffs made purchases for which they were extended credit without security. In the Spring of 1987, when they executed the note and mortgage, there was no additional extension of credit and the identity of the creditor was in no way altered. The only thing they did was establish security for a debt already incurred. Arguably, because the materials it had sold to the Stidhams had been used to rebuild the plaintiffs' home, Walker Builders, Inc., from the time it supplied materials for the construction of the house, had a security interest in the same property covered by the note and mortgage in the form of an unperfected materialmen's lien under Ala. Code § 35-11-210. These plaintiffs find themselves in the unusual posture of arguing that Walker Builders, Inc. loaned them $20,675.86 so that they might, in turn, pay off their debt of $20,675.86 to Walker Builders, Inc. The court concludes that this series of transactions constituted one or more credit sales. For

29

that reason, the Stidhams have no right to invalidate the security instruments or the underlying obligation under the Mini-Code, as it existed prior to April 17, 1990. *See Derico*, 410 So. 2d at 27 (That portion of the debt represented by the loan, but not that part represented by the contract for repair, is void.).

As noted, the Stidhams were not given a TILA disclosure statement at the time they signed the note and mortgage and were not afforded the opportunity to rescind the transaction. Because of the violation, the Stidhams are entitled and will be awarded statutory damages of $1,000 plus attorney fees of $500.00. Moreover, they retain the right to rescind the transaction and will be afforded a period of thirty (30) days following the entry of a final order in this matter to demand recission. Such right of recission shall be conditioned upon their payment of the entire amount covered by the note and mortgage plus interest at the legal rate.

## B.    Andre Toffel, Bankruptcy Trustee for Doug and Dana Graves.

In 1986, Doug and Dana Graves saw a home that was under construction by Jerry Hallmark, a part-time carpenter. They inquired of him whether the home was for sale. Because they had a poor credit rating, Mr. Hallmark referred them to C. D. Walker in order to inquire as to whether he could arrange financing of the purchase for them. On September 23, 1986, they executed a promissory note and a real estate mortgage (Graves Hearing, Plaintiff's Exhibit 6) in favor of Walker Builders, Inc. in the amount of $35,000. Of that amount, $27,000 was to cover the purchase of the home and $8,000 was to cover the purchase of additional building supplies from Walker Builders, Inc. They received a deed for the home that was signed by Jerry Hallmark and Coye Key. (Stidham Hearing, Plaintiff's Exhibit 7)

30

Subsequently, Mr. and Mrs. Graves executed a second note (Stidham Hearing, Plaintiff's Exhibit 8) and mortgage (Stidham Hearing, Plaintiff's Exhibit 8) in the amount of $5,000 to cover the costs of additional building materials and supplies for the home.

Neither of the promissory notes nor the mortgages signed by the Graves' contained the required cautionary statements. The notes were negotiable instruments other than checks and Walker Builders, Inc. was not licensed to make loans under the Mini-Code. These plaintiffs offered no evidence that they suffered any damages whatsoever from the transactions.

The Graves joined this action as plaintiffs by way of the first amended complaint on August 18, 1989. They claim here that the first note and mortgage are null and void under the holding of *Derico* to the extent that the money received represents a loan in violation of the Mini-Code. The court agrees.[12] The evidence is that these plaintiffs borrowed $27,000 from Walker Builders, Inc. to finance the purchase of a home from Jerry Hallmark and Coye Key. Walker Builders was not licensed to make such loans. Under *Derico*, the first note and mortgage are null and void to the extent of $27,000 plus interest on that amount. On the other hand, the remaining $8,000 plus interest on the first note and mortgage constituted credit sales and are not void under *Derico*. The same is true of the second note and mortgage in the amount of $5,000. Other Mini-Code claims of these plaintiffs are without merit. They suffered no injury by reason of the failure to include the statutory cautionary language and

---

[12] On the claims of some other plaintiffs, the court has previously held that equitable principles should be applied to impose a lien against the property used to secure the debt under such void instruments. In doing so, it erred and declines to repeat the error here. In *Edwards v. Alabama Farm Bureau Mutual Casualty Insurance Company*, 509 So. 2d 232, 236 (Ala. Civ. App. 1986), the Alabama Court of Civil Appeals held that violations of the licensing provision of the Mini-Code not only rendered the instrument void but also the underlying obligation.

the taking of a negotiable instrument on a credit sale did nothing more than deprive any

transferee of the note of holder-in-due-course status.

## C. B. C. and Alla Fowler.

B. C. and Alla Jane Fowler purchased a home from C. D. Walker in the fall of 1986.[13]

The Fowlers had seen the home while it was under construction by Mr. Price Robinson in

the Vinemont Subdivision of Cullman County, Alabama and had inquired about purchasing

it. Mr. Robinson referred them to Mr. C. D. Walker. Mr. Walker offered to sell the home for

$43,000.00. In connection with the purchase, the Fowlers signed a real estate promissory

note and a mortgage (Fowler Hearing, Plaintiff's Exhibit 1), each in the amount of $43,000.00.

Both were in favor of C. D. Walker. Neither the note nor the mortgage contained the

cautionary language required by the Alabama Mini-Code; the note was a negotiable

---

[13] The claims of Mr. and Mrs. Fowler are seemingly against C. D. Walker as an individual. Mr. Walker, however, died in March of 1996. The "defendants" have argued that claims against Mr. Walker individually should be dismissed because, prior to February 25, 1997, Mr. and Mrs. Fowler failed to file a motion under Rule 25(a) to substitute Mr. Walker's personal representative as the proper defendant. However, the record reflects no filing by "defendants" of a suggestion of the death of Mr. Walker prior to February 27, 1998. In December of 1996, in a supplemental brief that was not filed with the clerk, the "defendants" stated that Mr. Walker was deceased. They did not identify the proper party to be substituted for Mr. Walker. Then, on February 25, 1997, the plaintiffs moved to substitute "the estate of C. D. Walker" as the proper defendant.

In the opinion of the court, because the "defendants" did not identify the personal representative of the Walker estate, and thus the proper party to be substituted, they have never filed a sufficient formal suggestion of death contemplated by the framers of Rule 25(a), which tolls the ninety-day period allowed by Rule 25(a) to file the motion to substitute. Obviously, these lawyers knew or could have known the identity of the personal representative of the Walker estate.

On the other hand, plaintiffs' counsel have obviously had *de facto* notice of the death of Mr. Walker for many months. Yet, their motion to substitute inexplicably also failed to name the proper defendant. These lawyers have amply demonstrated their ability to search the probate records of Cullman and other North Alabama counties to ascertain information useful to them. (It is abundantly clear that these lawyers searched those records, determined the names of persons who had engaged in financial transactions with the Walkers, and then solicited those persons to join this lawsuit.) Because the plaintiffs failed to identify the proper party to be substituted, their motion to substitute, filed February 25, 1997, is a nullity.

By separate order, entered February 20, 1998, the court directed the parties to correct these deficiencies by identifying and substituting the proper party in place of Mr. Walker. On February 27, 1998, defendants filed a notice identifying the executor of the estate of C.D. Walker as Allan Walker. On March 11, 1998, the plaintiffs moved the court to substitute Allan Walker as executor of the estate of C.D. Walker as a proper party defendant. Subsequently, counsel for the estate of C.D. Walker informed the court it does not wish to object to plaintiffs' motion, and the motion is due to be granted.

instrument other than a check; and, Mr. Walker did not have the license required by the Mini-Code. On or about January 5, 1987, State Farm Fire & Casualty Company issued an insurance binder, effective December 13, 1986, showing the mortgagee as Walker Builders, Inc. (Fowler Hearing, Plaintiff's Exhibit 3) Mr. Walker testified in deposition that he usually built homes for sale by using the facilities of and by purchasing materials from Walker Builders, Inc.

Mr. Fowler testified that he understood he and Mrs. Fowler were signing a note and mortgage that would obligate them to repay the amount represented by the note and mortgage plus interest. The Fowlers offered no evidence that they had suffered any loss or injury by reason of the alleged Mini-Code violations. The Fowlers became plaintiffs in this action on August 18, 1989.

The plaintiffs argue that because Mr. Walker built the home "using" Walker Builders, Inc. they, in fact, purchased their home from Walker Builders and that Mr. Walker loaned them the money to make the purchase. Respectfully, the court disagrees.[14] The evidence was that Price Robinson referred the Fowlers to Mr. Walker when they expressed an interest in purchasing the home. The Fowlers negotiated the purchase with Mr. Walker. When they completed the purchase, they executed a note and mortgage in favor of Mr. Walker. A more reasonable inference, and the one the court finds, is that Mr. Walker built the home with materials purchased from Walker Builders, Inc. and that he satisfied his

---

[14] In disagreeing with the plaintiffs now, the court is also disagreeing with itself. At the close of the hearing on these claims, the court expressed an opinion that agreed with the plaintiffs. That opinion was error.

obligation to Walker Builders by having the note and mortgage executed in its favor.

Because the entire obligation evidenced by the Fowlers' note and mortgage constituted a credit sale, neither instrument nor the obligation are voided by rule in *Derico*. Other Mini-Code claims of these plaintiffs are without merit. They suffered no injury by reason of the failure to include the statutory cautionary language and the taking of a negotiable instrument on a credit sale did nothing more than deprive any transferee of the note of the benefits of being a holder-in-due-course.

### D.    Rebecca Carol Grew.

In the summer of 1985, plaintiff Grew negotiated a contract with builder Jerry Hallmark whereby he was to construct a shell home on property in Hayden, Alabama, which she had received as a gift from her mother. (Grew Hearing, Plaintiff's Exhibit 1) The agreed upon price was $18,500. (Grew Hearing, Plaintiff's Exhibit 2) Mr. Hallmark referred Ms. Grew to C. D. Walker for the purpose of obtaining financing for the construction of the house. The plaintiff saw Mr. Walker, who agreed that Walker Builders, Inc. would loan her $18,500 to build the home and would sell her an additional $6,500 worth of building materials so that she and her then husband could finish the interior of the house. On August 13, 1985, Ms. Grew and her then husband, Buster Lyn Prine, executed a promissory note and real estate mortgage in favor of Walker Builders, Inc. in the amount of $25,000. (Grew Hearing, Plaintiff's Exhibit 3) Neither the note nor the mortgage contained the cautionary language required by the Mini-Code; Walker Builders, Inc. did not then hold a license as required by the Mini-Code; and the promissory note was a negotiable instrument other than a check.

34

Ms. Grew became a plaintiff on August 18, 1989, when she was named in the First Amended Complaint. She claims that her note and mortgage are null and void under the holding of *Derico* to the extent that the money received represents a loan in violation of the Mini-Code. The court agrees.[15] The evidence is that Ms. Grew borrowed $18,500 from Walker Builders, Inc. to finance the construction of a home by Jerry Hallmark and an additional $6,500 to complete the inside of the house. Walker Builders was not licensed to make such loans. Under *Derico*, that portion of the note and mortgage which represented a loan for the construction of the house, including both principal and interest, are null and void. On the other hand, the remaining $6,500 plus interest on the note and mortgage constituted a credit sale and that amount is not void under *Derico*. Other Mini-Code claims of Ms. Grew are without merit. She suffered no injury by reason of the failure to include the statutory cautionary language and the taking of a negotiable instrument on a credit sale did nothing more than deprive any transferee of the note of holder-in-due-course status.

### E.    James Alan and Angela Johns.

In 1987, Mr. Johns talked to C. D. Walker about building some chicken houses for him. Mr. Johns testified, "Well, I went over there and I asked to speak with Sea Buck Walker, and he said he was Sea Buck Walker. I hadn't ever met him before. He wanted to know what I needed, and I told him I'd like to build some chicken houses, wondered if he'd build them for me." (Johns Hearing, Transcript at 4) Mr. Johns stated that after he returned with a deed to his property, Mr. Walker said, "he would help me build some chicken houses and finance them, but he said that all his hands were tied up at the time. And he asked me if I knew

---

[15]*See supra* note 12.

somebody that could build the chicken houses, and I told him I could probably try to find somebody. . . . And he told me how much that he would pay a square foot if somebody would build them. And so, we went from there." (Johns Hearing, Transcript 5)

Mr. Johns contacted Bill Hanners, a local builder of poultry houses, and told him the price that Mr. Walker was willing to pay. Mr. Hanners replied that "he probably would build them." (Johns Hearing, Transcript at 6) Two other individuals, Ricky Cornelius and Melvin McClendon, agreed to do the grading and chert work for a total of $13,000.00. Equipment for the chicken houses was purchased from Sherrill Smith for $100,000.

On or about January 12, 1987, Mr. and Mrs. Johns executed a promissory note (Johns Hearing, Plaintiff's Exhibit 1) and a mortgage (Johns Hearing, Plaintiff's Exhibit 2) in favor of Walker Builders, Inc. in the amount of $257,000.00. Neither the note nor the mortgage contained the required cautionary statement; the note was a negotiable instrument other than a check; and, Walker Builders, Inc. did not then hold a license as required by the Mini-Code.

Mr. Walker testified that Mr. Johns "came in there and wanted to know about getting some poultry houses built, and I told him I needed a commitment from the company that was going to furnish the chickens. And he brought me in a letter from Tyson Food, and we got the price on the excavation and the chert and put it all together, and I gave him a price of 250 something thousand dollars." (Johns Hearing, Transcript at 43) He also testified, "I gave him a total contract price before it ever started." (Johns Hearing, Transcript at 43) That price included "equipment, dirt hauling, chert and so forth?" (Johns Hearing, Transcript at

44) Mr. Walker testified that Mr. Hanner had built poultry houses for him for more than 20

years. (Johns Hearing, Transcript at 44)

He also described the way in which he generally built chicken houses and how he

dealt with the houses for Mr. Johns:

Q.    What is your method of dealing with people that supply equipment for
      chicken houses that you build?

A.    Well, of course, we get bids from the poultry equipment company,
      which is – it's installed to please the company that's going to put the
      chickens in there. Some of them want different types of equipment and
      some of them don't, on down the line.

Q.    How do you deal with the people who are going to put the equipment
      in your houses?

A.    Well, ever who we have an agreement with to put the equipment in,
      we go ahead and trade with them. And then when they get through and
      it's accepted by the–by the supplier, we pay them for it.

Q.    All right. Are you obligated to pay for those–for that equipment?

A.    Yeah. I'm obligated, yeah.

Q.    Do you remember talking to Mr. Johns about anything to do–having to
      do with equipment?

A.    Yeah. He came in there and we were going to go with Southern Ag,
      and he wanted to go with Sherrill Smith. And I called Sherrill, and me
      and him traded the equipment.

Q.    So you talked to Mr. Smith yourself about the equipment?

A.    Oh, yeah.

Q.    And did you make an agreement with him about the payment for the
      equipment?

A.    That's right.

(Johns Hearing, Transcript at 45-46)

The plaintiffs argue that the portion of the total obligation incurred by them that represents the costs of chert, grading, and poultry equipment was a loan for purposes of the Mini-Code and due to be voided because Walker Builders, Inc. did not have the required Mini-Code license. The court disagrees. The only reasonable inference to be drawn from the evidence is that Walker Builders, Inc. acted in the role of a contractor and seller of four completed poultry houses. Walker quoted Mr. Johns a fixed price for delivery of completed chicken houses. Walker Builders was obligated to pay the costs of chert, grading, and equipment. In fact, Mr. Walker testified that he negotiated directly and "traded" with the seller of the poultry house equipment.

The court having concluded that the entire obligation was incurred as a part of a credit sale, none of the obligation may be voided under the teaching of *Derico*. Other Mini-Code claims of Mr. and Mrs. Johns are without merit. They failed to prove they suffered any injury by reason of the failure to include the statutory cautionary language and the taking of a negotiable instrument on a credit sale did nothing more than deprive any transferee of the note of holder-in-due-course status.

## V. Conclusion.

Contemporaneously with the entry of this memorandum of opinion, the court will enter a final judgment on all remaining claims of all plaintiffs. Any party who asserts that the court has overlooked any claim of any plaintiff shall so notify the court in writing within ten (10) days of the date on which this opinion and the accompanying order is entered.

Done, this ___6th___ of April, 1998.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE